## In re RESOURCE AMERICA SECURITIES LITIGATION.

### No. CIV. A. 98–5446.

United States District Court,
E.D. Pennsylvania.

Aug. 6, 2001.

---

Stuart Savett, Philadelphia, PA, Matthew J. Zevin, Los Angeles, CA, for plaintiff.

Alan J. Davis, William A. Slaughter, Philadelphia, PA, for Resource America, Inc.

Kerrin Kowach, Pittsburgh, PA, for Grant Thornton.

### MEMORANDUM

DuBOIS, District Judge.

Presently before the Court is plaintiffs' Motion for Class Certification (Document No. 31, filed September 15, 2000), Defendants' Joint Brief in Opposition to Plaintiffs' Motion for Class Certification (Document No. 32, filed November 22, 2000), and Plaintiffs' Reply Memorandum in Support of Their Motion for Class Certification (Document No. 33, filed December 19, 2000). Oral argument on the Motion was held on March 16, 2001. For the following reasons, plaintiffs' Motion for Class Certification will be granted

## I. BACKGROUND

On October 14, 1998, Theodore M. Birnbaum filed the initial complaint in this case, alleging various securities violations. By Order dated December 22, 1998, a related case, *Leigh v. Resource America*, 98–6265, was consolidated with this case and Theodore M. Birnbaum, Linda Ashear, Michael Trent and Curt Griffin were appointed Lead Plaintiffs. Plaintiffs then filed a First Consolidated Amended Complaint on February 22, 1999, alleging violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. §§ 78j(b), 78t–1, and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. A Second Consolidated Amended Complaint was filed on February 1, 2001, adding two paragraphs concerning the sale of a senior lien interest ("Second Amended Complaint").

Plaintiffs allege in the Second Amended Complaint that the Resource America defendants[1] and defendant Grant Thornton, LLP ("Grant Thornton") engaged in a course of conduct that was designed to, and did materially, misstate the revenues and net income of Resource America, Inc. throughout the class action period in direct violation of Generally Accepted Accounting Principles ("GAAP") by, *inter alia,*:

A. improperly recognizing gains from the sale of senior liens on its loan portfolio;

B. improperly employing the accretion-of-discount method of recognizing revenue on distressed loans that Resource America, Inc. purchased at discounts;

C. failing to properly discount cash flows on subordinated loan interests that Resource America, Inc. refinanced with other lenders; and

D. engaging in concerted conduct to wrongfully increase Resource America, Inc.'s reported revenues. *See* Second Amended Complaint at ¶ 2.

As set forth in the Second Amended Complaint, the details of Resource America, Inc.'s scheme involved purchasing distressed loans on income-producing properties, obtaining artificially-inflated appraisals on the properties securing the loans, and then selling certain senior loan interests to a related party

---

1. The "Resource America defendants" are the corporate entity Resource America, Inc., and the following individually named defendants who were directors and/or officers of the company during the proposed class period: Edward E. Cohen, Scott F. Schaeffer, Daniel G. Cohen, Michael L. Staines, Carlos C. Campbell, Andrew M. Lubin, Alan D. Schrieber, John S. White, Steven J. Kessler, and Nancy J. McGurk.

or others and, relying on alleged artificially inflated appraisals, recognizing significant non-cash "gain on sale" and "accretion of discount" income, which was then used to materially overstate current and historical revenues, earnings and assets, on which members of the plaintiff class allegedly relied in purchasing stock. *See* Second Amended Complaint at ¶ 3. The scheme allegedly resulted in inflation of the price of Resource America, Inc. common stock and allowed Resource America, Inc. to complete a 1.75 million share public offering, raising approximately $112 million dollars prior to the payment of underwriters' fees during the class period. *See* Second Amended Complaint at ¶ 4.

According to plaintiffs, the scheme began to unravel on Friday, August 21, 1998, when rumors circulated that Resource America, Inc. engaged in fraudulent accounting practices, as a result of which the price of the common stock dropped $5.6875 to close at $29.125. The following Monday, August 24, 1998, additional rumors circulated about Resource America, Inc.'s financial health and future business prospects. On August 24, 1998, Mark Roberts, director of research for "Off Wall Street Reports," published by Off Wall Street Consulting Group, Inc., in Cambridge, Massachusetts, issued a report ("Roberts' Report") that stated that he did not believe Resource America, Inc.'s "accounting reflects the true economics of business" or "compliance with Generally Accepted Accounting Principles." On August 25, 1998, the price of Resource America, Inc.'s common stock declined to $19.125. Second Amended Complaint at ¶¶ 85–93. Following the distribution of the Roberts' Report, the price of Resource America, Inc.'s common stock dropped to as low as $7.25 per share. *See* Second Amended Complaint at ¶ 4.

The Second Amended Complaint also alleges that Resource America, Inc.'s accountant, defendant Grant Thornton, issued a series of false and misleading opinion letters directed to Resource America, Inc.'s shareholders supporting its use of improper accounting methods despite the fact that Grant Thornton knew or recklessly disregarded the fact that throughout the proposed class period, Resource America, Inc.'s method of accounting artificially inflated its reported revenues and earnings in violation of GAAP. *See* Second Amended Complaint at ¶ 5.

On September 15, 2000, plaintiffs filed the instant Motion for Class Certification. Oral argument was held on March 16, 2001. In their Motion, plaintiffs propose that the Court certify the following class:

> All persons who purchased or otherwise acquired the stock of Resource America, Inc. during the period between December 17, 1997 and February 22, 1999, inclusive; excluded from the Class are the defendants, all officers and directors of Resource America, Inc. and/or any of its subsidiaries, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

Plaintiffs also ask the Court to appoint Michael Trent and Curt Griffin as the class representatives,[2] the law firm of Weiss & Yourman as class counsel and the firm of Savett Frutkin Podell & Ryan, P.C. as liaison counsel.[3]

## II. STANDARD FOR CLASS CERTIFICATION

A class action suit is appropriate when the "issues involved are common to the class as a whole." *Califano v. Yamasaki,* 442 U.S. 682, 701, 99 S.Ct. 2545, 2557, 61 L.Ed.2d 176 (1979). Under those circumstances, the certification of a class may both promote judicial economy and save resources for parties who may otherwise repeatedly litigate the same issue. *See id.*

For the Court to certify a plaintiffs' class, plaintiffs must satisfy the four prerequisites for a class action set forth in Federal Rule of

---

**2.** Plaintiffs had initially proposed Linda Ashear as a third class representative, but have since withdrawn her application because of her unforeseen personal obligations and circumstances.

**3.** By Order dated December 21, 1998, the Court approved Weiss & Yourman as Lead Counsel for the class and Savett Frutkin Podell & Ryan, P.C. as Liaison Counsel for the class pursuant to § 21D(a)(3)(B)(v). 15 U.S.C. § 78u-4(a)(3)(B)(v).

Civil Procedure 23(a) and the requirement of Rule 23(b)(3).

The four elements of Rule 23(a) are:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). These four elements are often referred to as " 'numerosity', 'commonality', 'typicality', and 'adequacy of representation,' respectively." *See Hanrahan v. Britt,* 174 F.R.D. 356, 361 (E.D.Pa.1997). " '[C]ommonality' like 'numerosity' evaluates the sufficiency of the class itself, and 'typicality' like 'adequacy of representation' evaluates the sufficiency of the named plaintiff[s]. . . ." *Hassine v. Jeffes,* 846 F.2d 169, 176 n. 4 (3d Cir.1988).

Plaintiffs must also establish that the putative class action meets the requirements of Rule 23(b)(3):

the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any. litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3).

## III. DISCUSSION

### A. The Four Elements of Rule 23(a)

#### 1. *Numerosity*

Satisfaction of the first prerequisite, numerosity, does not require evidence of the exact number or identification of the members of the proposed class, but rather that the proposed class is so "numerous that joinder of all members is impracticable." *See Hanrahan,* 174 F.R.D. at 362 (citing Fed. R.Civ.P. 23(a)(1)). In determining whether a proposed class meets the numerosity requirement, "a court may accept common sense assumptions." *In re Cephalon Securities Litigation,* 1998 WL 470160, *2 (E.D.Pa. Aug.12, 1998).

Plaintiffs maintain that while the exact number of putative class members cannot be ascertained until appropriate records discovery is undertaken, as of August 1998, Resource America, Inc. had approximately 6,503,987 shares of common stock outstanding and actively traded on the NASDAQ, and therefore plaintiffs allege that the potential class consists of tens of thousands of members. *See* Second Amended Complaint at ¶ 22. At oral argument, plaintiffs characterized the number of class members as "probably in the low thousands." Hr'g Tr. at 5. Defendants have not disputed that the class would meet the numerosity requirement. Therefore, the Court concludes that plaintiffs' proposed class meets the numerosity requirement of Rule 23(a)(1).

#### 2. *Commonality*

Rule 23(a)(2) requires the existence of questions of law or fact common to the class.[4] This requirement is easily met because it may be fulfilled by a single common issue. *See Baby Neal ex rel. Kanter v. Casey,* 43 F.3d 48, 56 (3d Cir.1994). "Class actions are a particularly appropriate and desirable means to resolve claims based on the securities laws, 'since the effectiveness of the securities laws may depend in large measure on the application of the class action device.' " *Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir.1985) (citing *Kahan v. Rosenstiel,* 424 F.2d 161, 169 (3d Cir.1970)). The commonality requirement is permissively applied in the context of securities fraud litigation. *See*

---

4. Rule 23(b)(3) requires that common questions predominate over individual ones. This question will be discussed, *infra,* in § III.B.1.

*Moskowitz v. Lopp,* 128 F.R.D. 624, 628 (E.D.Pa.1989). Allegations that a company "and its management omitted material information from its public disclosures thereby inflating the price of . . . stock is the paradigmatic common question of law or fact in a securities class action." *Id.* at 629.

The gist of the plaintiffs' case is that the Resource America defendants and Grant Thornton misrepresented and omitted material facts concerning the finances of Resource America, Inc. Plaintiffs have identified seven questions of law and fact common to all members of the class:

(a) whether the federal securities laws were violated by defendants' acts;

(b) whether defendants participated in and pursued the common course of conduct about which plaintiffs complain;

(c) whether defendants misstated the financial results of Resource America, Inc. in public statements, including press releases and filings with the SEC, in violation of GAAP;

(d) whether documents, press releases and other statements disseminated to the investing public and the shareholders of Resource America, Inc. during the proposed class period misrepresented and/or omitted material facts concerning Resource America, Inc.'s business, financial position and condition, and future business prospects;

(e) whether the defendants acted with scienter in knowingly or recklessly omitting and/or misrepresenting material facts regarding Resource America, Inc.'s true financial position and condition;

(f) whether, during the proposed class period, the material misrepresentations, omissions and failure to correct the material misrepresentations complained of artificially inflated the price of Resource America, Inc. common stock; and

(g) whether the members of the proposed class sustained damages, and if so, the proper measure thereof.

Whether defendants participated in the actions alleged is a common question. *See, e.g.,* *Hanrahan,* 174 F.R.D. at 363 (whether defendants, *inter alia,* systematically made fraudulent misrepresentations or negligent misrepresentations in connection with the promotion of distributorships is common question); *Kline v. First Western Gov't Sec., Inc.,* 1996 WL 153641, *4 (E.D.Pa. Dec.21, 1995) ("Whether fraudulent misrepresentations and/or material omissions were contained in . . . opinion letters and . . . materials—are issues common to all class members. Indeed, these are the paradigmatic issues in securities fraud class action cases."). Further, defendants have not disputed that plaintiffs can establish the commonality requirement.

Considering all of plaintiff's allegations, the Court concludes there are significant questions of law and fact common to the class. Thus, the commonality requirement is met.

### 3. *Typicality*

██ Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." "Typicality asks whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." *Baby Neal,* 43 F.3d at 55. In evaluating typicality, the Court should consider whether "the named plaintiff's individual circumstances are markedly different or . . . the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." *Eisenberg,* 766 F.2d at 786. A finding of typicality will generally not be precluded even if there are "pronounced factual differences" where there is a strong similarity of legal theories. *In re Cephalon Sec. Litig.,* 1998 WL 470160, at *2 (citing *Baby Neal,* 43 F.3d at 58).

Defendants argue that Curt Griffin is not a typical class representative because he purchased his shares of Resource America, Inc. after the market became aware of the alleged fraud. It is their position that the class period should end on August 21, 1998, when the rumors about defendants' fraudulent ac-

counting practices first surfaced, or at the latest, August 24, 1998, when the Roberts' Report was first published, and since Mr. Griffin purchased his shares on August 25, 1998, he is subject to unique defenses.

### a. *Class Dates*

The mainstay of defendants' argument on the typicality issue is that the class period should close when the market first became aware of the misrepresentations upon which the complaint is based, either August 21 or 24, 1998. Plaintiffs ask for a class period to run from December 17, 1997 through February 22, 1999. Defendants do not challenge the proposed start date for the class period.

According to defendants, the class should close when the market became aware of the alleged misrepresentations, through the rumors circulating about Resource America, Inc.'s financial health and future business prospects, and/or through the Roberts' Report. They take the position that the rumors and/or the Roberts' Report amounted to curative disclosures, after which no reasonable investor could have bought Resource America, Inc.'s stock without being aware of the allegations of fraud.

When a district court is presented with the question of the length of the class period during the class certification proceedings in a securities case, it must consider two lines of authority. The first, *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), teaches that the Court must not inquire "into the merits of a suit in order to determine whether it may be maintained as a class action." *Id.* at 177, 94 S.Ct. at 2152. The second directs the Court to "inquire only into whether 'the facts which underlie the gravamen of the plaintiff's complaint ... represent a reasonable basis on which an individual purchaser or the market *would* rely.'" *Lerch v. Citizens First Bancorp.,* 144 F.R.D. 247, 253 (D.N.J.1992) (quoting *In re IGI Sec. Litig.,* 122 F.R.D. 451, 462 (D.N.J.1988)) (emphasis and ellipses in original). *See also, In re Data Access Sys. Sec. Litig.,* 103 F.R.D. 130 (D.N.J.1984), *rev'd on other grounds,* 843 F.2d 1537 (3d Cir.1988); *Schaffer v. Timberland Co.,* 1996 U.S. Dist. Lexis 5372, *29 (D.N.H. Mar. 19, 1996) ("Al-

though the court possesses the authority to address the propriety of the proposed class scope and period, in this case the defendants' 'arguments about the commencement and termination dates of a proposed class period raise questions of fact going to the merits, and are therefore not a proper subject for inquiry at the certification stage.'" (quoting *Weinberger v. Thornton,* 114 F.R.D. 599, 606 (S.D.Cal.1986))).

### (i) *Beginning Date*

The Complaint alleges that Resource America, Inc.'s fraudulent scheme dates back at least as far as December 17, 1997, when Resource America, Inc. filed its Report on Form 10–K for the fiscal year ending September 30, 1997. Second Amended Complaint at ¶ 38. The defendants do not challenge this date as the beginning of a potential class period. This filing certainly represents "a reasonable basis on which an individual purchaser or the market would rely." *Lerch,* 144 F.R.D. at 253. Therefore, the Court will accept December 17, 1997 as the beginning date for the proposed class.

### (ii) *Ending Date*

■ In order for a court to shorten a proposed class period at the certification stage in a securities case involving fraud on the market, the court must be able to rule, as a matter of law, that a curative disclosure had been made so as to render it unreasonable for an investor, or the market, to continue to be mislead by the defendants' alleged misrepresentations. *See Semerenko v. Cendant Corp.,* 223 F.3d 165, 181 (3d Cir.2000) (announcement by company that it had made prior misrepresentations was curative and made those prior misrepresentations immaterial as a matter of law); *In re ORFA Sec. Litig.,* 654 F.Supp. 1449, 1465 (D.N.J.1987) ("The appropriate legal inquiry to determine the duration of the class period looks for a time when the securities law violations are terminated by curative information.") (citing *McFarland v. Memorex Corp.,* 96 F.R.D. 357, 364 (N.D.Cal.1982); *Weiner v. Quaker Oats Co.,* 129 F.3d 310 (3d Cir.1997)) (holding that a public statement curing the misleading

effect of a prior misrepresentation renders the prior misrepresentation immaterial).

Defendants cite numerous cases in which courts have shortened proposed class periods because it would have been unreasonable, as a matter of law, for investors or the market to rely upon prior misrepresentations. *See Semerenko*, 223 F.3d 165; *Lerch*, 144 F.R.D. 247; *In re LTV Sec. Litig.*, 88 F.R.D. 134 (N.D.Tex.1980). However, all of those cases are distinguishable because the curative disclosures came, in a rather forceful manner, from the companies themselves.

In *Semerenko*, when Cendant discovered potential accounting irregularities, it announced its findings in several public statements, and publicly stated it would conduct an investigation. *Semerenko*, 223 F.3d at 170–71. No such announcement was made by Resource America, Inc.

In *LTV*, the court held that a class period should close on the date the defendant announced it would be restating its earnings as a result of accounting irregularities, rather than on the requested date, approximately two months later, when the financial statements were actually restated. *LTV*, 88 F.R.D. at 147–48. On the earlier date, LTV "announced its request to the SEC to suspend trading in the securities for 10 days with a press release specifically stating that" possible adjustments might be made to the value of its steel subsidiary's inventories which "would have a materially adverse impact on the reported results of the operations" of the subsidiary and LTV. *Id.* at 147. Such an announcement, followed by the suspension of trading, was a clear indication to the market that there was something potentially wrong with the valuation of LTV stock, and that it would not be reasonable for an investor to rely on previously disclosed information.

Plaintiffs argue that their case is distinguishable from *LTV*, and the Court agrees. Resource America, Inc. made no curative

disclosure or anything remotely close to it. Unlike LTV, Resource America, Inc. continued to deny the existence of the alleged any fraud and misrepresentations after they were made public.[5]

*Lerch v. Citizens First Bancorp, Inc.*, 144 F.R.D. 247 (D.N.J.1992), is more analogous to this matter. That case concerned, *inter alia*, when, as a matter of law, it could be held that curative information was publicly announced or effectively disseminated in a situation where the plaintiffs alleged that the financial condition of defendant bank, Citizens First Bancorp, Inc. ("Citizens"), was fraudulently misrepresented so as to artificially inflate the price of the bank's stock. The court debated using three dates for ending the class period— 1) August 1, 1990, when the first reports began to circulate about a government investigation into Citizens, and when Citizens' Chairman still depicted the bank as a healthy financial institution; 2) August 31, 1990, several days after the Chairman resigned and after news reports that the bank had "34M of red ink" and that hundreds of thousands of dollars of defaulted loans had been made to an auditor; or 3) October 4, 1990, when the bank announced it would not pay its dividends for that quarter. Eventually, the court adopted the August 31, 1990 date because "the effect of the initial [allegedly fraudulent] statements was sufficiently dissipated to warrant the designation of this date as the end of the class period." *Id.* at 255 (citing *Peil v. National Semiconductor Corp.*, 86 F.R.D. 357, 369 n. 12 (E.D.Pa.1980)) (brackets in original).

*In re ORFA Securities Litigation*, 654 F.Supp. 1449 (D.N.J.1987), a case mentioned by defendants at oral argument, Hr'g Tr. at 34, stands for the proposition that publication of information in the press or issuance of press releases exposing allegations of misrepresentations serves to cut off the time period during which one could reasonably rely on the misrepresentations.[6] *Id.* at 1465.

---

5. The Court takes no position at this time as to whether the defendants' conduct is actionable. The question of whether defendants should have issued a curative disclosure will not be addressed in this Memorandum. *See Eisen*, 417 U.S. at 177, 94 S.Ct. at 2152, 40 L.Ed.2d 732.

6. The Court notes that several courts have also cited *Cohen v. Uniroyal, Inc.*, 77 F.R.D. 685 (E.D.Pa.1977) for the proposition that it was no longer reasonable to rely on corporate misrepresentations and omissions after an article appeared in *Forbes Magazine* detailing those mis-

In that case, an article published in *Barron's* revealed that various material facts had not been disclosed by ORFA or had been disclosed in a misleading manner. *Id.* at 1452–53 & n. 3. The court said that the "relevant question is only whether the article made it unreasonable to continue relying on the alleged misrepresentations, not who was responsible for the article." *Id.* at 1465. Significantly, the *ORFA* opinion does not state whether ORFA continued to refute the allegations made in the *Barron's* article.

■ It is clear that a court should close a proposed class period in a case such as this one, when, as a matter of law, it would be unreasonable for an investor to rely on the alleged misrepresentations. That can occur when a defendant makes a curative disclosure or, as in *ORFA*, publication of curative information makes it unreasonable for the market to continue to rely on the alleged misrepresentations. In this case, it is undisputed that there were no curative disclosures by Resource America, Inc. as it continued to deny any wrongdoing. That leaves the question whether the Roberts' Report, coupled with Resource America, Inc.'s continued denials of wrongdoing after its publication, constitute curative information. The Court concludes they do not.

Plaintiffs argue that defendants aggressively attempted to counter the Roberts' Report by asserting that the allegations in the report were inaccurate. For example, on August 25, 1998, defendant Edward Cohen criticized the report as containing "erroneous statements and simplistic analysis." Second Amended Complaint ¶ 94. On August 26, 1998, defendants stated in a number of sources, including *Dow Jones*, that the Roberts' Report was "totally inaccurate, false and misleading." *Id.* ¶ 98. Between August 26, 1998 and September 3, 1998, Resource America, Inc.'s stock price traded between approximately $15.50 and $13.25. *Id.* ¶ 97. On September 3, 1998, Mark Roberts published a second report which further detailed his criticism of defendants' accounting practices. Resource America, Inc. again denied wrongdoing—defendants told *Dow Jones Online Service* that the Roberts' report was "false and misleading" and that their "earnings are continuing as expected, and we don't expect to make any negative announcements." *Id.* ¶ 99. Defendants also made an announcement via the *Business Wire* that its independent auditors had reaffirmed the correctness of their accounting. *Id.* ¶ 101. On September 18, 1998, Grant Thornton publicly reaffirmed its auditing of Resource America, Inc.'s financial statements. *Id.* ¶ 101–102. In response to this new information, the price of Resource America, Inc.'s stock rose 26%. Nettesheim Aff. at ¶ 27.

The Roberts' Report, standing alone, might be sufficient to constitute curative information. However, when coupled with the aggressive public comments of Resource America, Inc. aimed at countering the effect of the report, the Court concludes it was not curative information or a curative disclosure. Considering all of the information provided to the market after publication of the Roberts' Report, it would not have been unreasonable for an investor to rely on defendants' alleged misrepresentations after its publication. The Court rejects defendants' contention that the Roberts' Report constitutes a curative disclosure because the report is not the equivalent of "a barrage of news reports sufficient to outweigh defendants' assurances as a matter of law." *Lerch,* 144 F.R.D. at 253.

■ Plaintiffs argument, that a class period can extend until a curative disclosure is made, is problematic in that, if there is a genuine dispute as to whether there was wrongdoing on the part of defendants, the class period could, in theory, continue *ad infinitum,* or until a final ruling by a court on the merits of the case. However, the Court is mindful that at the class certification stage doubts should be resolved in favor of extending the class period. *See, e.g., Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir. 1985) (doubts should be resolved in favor of

---

representations and omissions. *See, e.g., In re Data Access Sys. Securities Litig.,* 103 F.R.D. 130, 144 (D.N.J.1984); *In re ORFA Sec. Litig.,* 654 F.Supp. at 1465. The plaintiffs in *Cohen* did not request a class extending past the publication of the *Forbes* article, nor did then District Judge A. Leon Higginbotham, Jr. make any finding of that nature.

allowing a class action); *Lerch,* 144 F.R.D. at 254 ("doubts regarding the reasonableness of the reliance 'should be resolved in favor of extending the class period,' when allegedly fraudulent optimistic projections are so dissipated as to make it unreasonable for a potential investor to continue to rely on those projections, the Court may narrow the class period accordingly" (quoting *In re Data Access Systems* 103 F.R.D. at 143)).

That leaves open the question whether to close the class period when the initial complaint was filed in the *Birnbaum* case on October 14, 1998,[7] when the First Consolidated Amended Complaint was filed on February 22, 1999, or on some other date. Plaintiffs argue that the class should close on the February date. Defendants do not address the issue in their brief, but at oral argument, they argued, in essence, that if the date the Complaint is filed triggers the closing of the class period, the Court should adopt the date on which the first complaint was filed.

According to plaintiffs, after the initial complaint was filed, defendants continued to make misrepresentations about Resource America, Inc. As an example, plaintiffs point to the filing by Resource America, Inc. on December 29, 1998 of its Form 10–K which, according to plaintiffs, continued to falsely and misleadingly represent Resource America, Inc.'s revenues and earnings from its commercial loan operations. Second Amended Complaint ¶ 105. There are no allegations of misrepresentations after December 29, 1998.

In *In re Kirschner Medical Corporation Securities Litigation,* 139 F.R.D. 74 (D.Md. 1991), the court was faced with a similar problem of when to end the class period. *Kirschner* involved allegations of false and misleading statements of the defendant's financial condition beginning on November 14, 1989. *Id.* at 82. In certifying a class period ending on April 9, 1990, the court noted that

> Defendants also argue that "nothing of consequence is ... alleged to have happened between January 26, 1990, and April 9, 1990," [the latter date being when a

curative disclosure was made] and alternatively, that March 22, 1990, the day plaintiffs Michelle Mrdeza and Patrick Magrath filed suit, is an appropriate termination date since, according to defendants, all relevant information was a matter of public record by that time. The Complaint, however, clearly alleges that on April 2, 1990 defendants again misled the public by announcing that Kirschner had renegotiated its bank loans and had made a decisions to implement a major restructuring of the company. In light of these allegations, the Court rejects these contentions.

*Id.* at 83 n. 4 (citations to court documents omitted).

Likewise, the Second Amended Complaint alleges that defendants misled the public on December 29, 1998, after the filing of the first complaint on October 14, 1998, in Resource America, Inc.'s Form 10–K. In light of these allegations, the Court rejects the October date and instead concludes that the proper end date of the class period should be February 22, 1999, the date the First Consolidated Amended Complaint was filed.

■ The Court will, however, retain the discretion to redefine the length of the class should that become necessary at a later time. *See Barnes v. American Tobacco Co.,* 161 F.3d 127, 140 (3d Cir.1998) ("Under Rule 23(c)(1), District Courts are required to reassess their class rulings as the case develops."); *In re General Motors Corp. Pick–Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 793 n. 14 (3d Cir.1995) ("Under Rule 23(c)(1), the court retains the authority to redefine or decertify the class until the entry of final judgment on the merits."); *Lerch,* 144 F.R.D. at 255 n. 2.

### b. *Mr. Griffin as a Class Representative*

Defendants argue that Curt Griffin is not a typical purchaser of Resource America, Inc. common stock because he purchased his shares on August 25, 1998, four days after the first rumors about the alleged misrepre-

---

7. The Complaint in *Birnbaum v. Resource America, Inc.,* 98–5446, was filed on October 14, 1998, and proposed a class period ending on August

28, 1998. The Complaint in *Leigh v. Resource America, Inc.,* 98–6265, was filed on December 2, 1998 and proposed an identical class period.

sentations surfaced. At oral argument, defendants conceded that if the Court does not shorten the proposed class period, "Mr. Griffin does stay in." Hr'g Tr. at 39.

"The typicality requirement is satisfied if the plaintiff's claim arises from the same event or course of conduct that gives rise to the claims of other class members and is based on the same legal theory. Even pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories." *In re Cephalon Sec. Litig.*, 1998 WL 470160, at *2 (E.D.Pa.1998) (citations omitted). Here, both Mr. Griffin and Mr. Trent,[8] according to plaintiffs allegations, purchased stock in Resource America, Inc. at artificially inflated prices during the proposed class period. The claims are typical because they seek to recover damages based on the same materially false and misleading statements and course of conduct that gave rise to the claims of the class. *See In re Centocor, Inc., Sec. Litig.*, 1999 WL 54530, *2 (E.D.Pa.1999) (finding typicality in a securities fraud class action, where plaintiffs alleged a single course of public misrepresentation which affected stock prices, and members of proposed class purchased securities on the open marked during the class period).

The Court concludes that the factual circumstances and legal claims of the named plaintiffs will not significantly differ from the claims of the other class members. *See id.* Therefore, both Mr. Griffin and Mr. Trent are typical representatives of the class.

### 4. *Adequacy of Representation*

■ The adequacy of the class representative is dependent on satisfying two factors: 1) that the plaintiffs' attorney is competent to conduct a class action; and 2) that the class representatives do not have interests antagonistic to the interests of the class. *See In re General Motors Corp. Pick–Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d at 800–

01; *Rendler v. Gambone Bros. Dev. Co.*, 182 F.R.D. 152, 159 (E.D.Pa.1998); *In re Cephalon Sec. Litig.*, 1998 WL 470160, at *3. Defendants do not challenge the qualifications of plaintiffs' counsel. They do, however, argue that Mr. Trent is not an adequate representative of the class because he was not sufficiently involved with the case; rather they argue he is simply lending his name to the case. The Court notes that defendants do not challenge the adequacy of Mr. Griffin as a class representative, and characterized him at oral argument as "probably the paradigm of what you would want of an adequate class representative." Hr'g Tr. at 38.

"[T]he class representative's complete understanding of the legal basis for the claims is not required by Rule 23." *In re Cephalon Sec. Litig.*, 1998 WL 470160, at *3 (citing *Barnes v. American Tobacco Co.*, 176 F.R.D. 479, 486–86 (1997)). "[I]t is unrealistic to require a class action representative to have an in-depth grasp of the legal theories of recovery behind his or her claim. It is more important that the representative actively seeks vindication of his or her rights and engages competent counsel to prosecute the claims." *Id.* (citing *Barnes*, 176 F.R.D. at 486.).

Defendants argument that Mr. Trent is an inadequate class representative is based on the following: he became involved in the case only after seeing a notice placed by attorneys on the Internet, he did not read the complaint prior to signing the certification, he only skimmed the original complaint and the First Consolidated Amended Complaint,[9] and he is unaware of any of the underlying facts. In response, plaintiffs state that Mr. Trent has a basic understanding of the allegations made in the case, and what law is alleged to have been violated, and that he would be willing to contest an action by his attorneys with which he did not agree.

Defendants cite *Griffin v. GK Intelligent Sys., Inc.*, 196 F.R.D. 298 (S.D.Tex.2000), in

**8.** Defendants also challenge the adequacy of Mr. Trent as a class representative. This will be discussed below. *See infra*, Section III.A.4.

**9.** As Mr. Trent's deposition was taken before the Second Amended Complaint was filed, the Court does not have any information as to whether or

not he read the Second Amended Complaint. The Court notes, however, that the First Consolidated Amended Complaint and the Second Amended Complaint are identical except for two paragraphs added to the latter complaint.

which the court deemed the named plaintiffs to be inadequate class representatives because they were

> solicited for this lawsuit and have taken little or no supervisory role over lead counsel. They do not participate in litigation decisions, do not receive regular cost/expense information, and they learn of activity in the case when they are copied on matters already completed. Although it is clear that both [proposed representatives] would like to recover their investment, it is equally clear that they are lending their names to a purported class action solely at the suggestion of lead counsel.

*Id.* at 302.

Based on Mr. Trent's deposition testimony, he is certainly more involved in the case than the rejected class representatives in *Griffin*. The Court concludes that he is an adequate class representative, and will allow him to serve as such. The Court will certify both Mr. Griffin and Mr. Trent as class representatives.

### B. The Two Elements of 23(b)(3)

Once the four elements of Rule 23(a) have been satisfied, plaintiffs must satisfy the two prongs of Rule 23(b)(3). First, plaintiffs must show that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Fed.R.Civ.P. 23(b)(3). Secondly, plaintiffs must show that "a class action is superior to other available methods for the fair an efficient adjudication of the controversy." *Id.*

#### 1. *Predominance*

Generally, plaintiffs must establish that they relied on misrepresentations or omissions by the defendant. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 178 (3d Cir.2000). However, in securities fraud cases, when a claim is predicated on a fraud on the market theory, there is a presumption that common issues of reliance predominate over any individual issues. *See id.; Basic v. Levinson*, 485 U.S. 224, 242, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988); *Zlotnick v. TIE Communications, Inc.*, 123 F.R.D. 189, 194–95 (E.D.Pa.1988). In essence,

The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

*Basic*, 485 U.S. at 241–42, 108 S.Ct. at 989 (quoting *Peil v. Speiser*, 806 F.2d 1154, 1160–61 (3d Cir.1986)) (ellipses in original). To take advantage of the presumption applicable in fraud on the market cases, plaintiffs must allege or present facts sufficient to raise the inference that Resource America, Inc.'s stock traded in an efficient market. *See Wiley v. Hughes Capital Corp.*, 746 F.Supp. 1264, 1289 (D.N.J.1990).

When using the fraud on the market theory of reliance, the court presumes " (1) that the market price of the security actually incorporated the alleged misrepresentations, (2) that the plaintiff actually relied on the market price of the security as an indicator of its value, and (3) that the plaintiff acted reasonably in relying on the market price of the security." *Semerenko*, 223 F.3d at 178–79.

Typically, courts look at a number of factors in determining whether or not a market is efficient. While there is no definitive list, the court in *Cammer v. Bloom*, 711 F.Supp. 1264 (D.N.J.1989), listed five factors which lead to the presumption that there is an efficient market. Those factors are as follows: 1) An actively traded market, as evidenced by a large weekly volume of stock trades, such as an average weekly turnover of one or two percent of the outstanding shares; 2) That a significant number of securities analysts followed and reported on a company's stock during the class period; 3) That it could be alleged the stock had numer-

ous market makers; [10] 4) That the company filed an S–3 Registration Statement in connection with public offerings; [11] and 5) That the plaintiff alleged empirical facts showing a cause and effect relationship between unexpected corporate events and financial releases and an immediate response in the stock price. *See id.* at 1286–87.

The plaintiffs have alleged sufficient facts in the Second Amended Complaint to satisfy the five factors outlined in *Cammer.* The facts as alleged are as follows: Resource America, Inc. common stock traded on the NASDAQ. Second Amended Complaint at ¶ 22. Prior to the secondary offering in April 1998, the average weekly trading volume was 1.4% of the shares outstanding, and after the secondary offering, the average weekly trading volume was averaged more than 14% of the shares outstanding. Aff. of Jane D. Nettesheim, Ex. A to Doc. 33 ("Nettesheim Aff."). Resource America, Inc. common stock was followed by at least five securities analysts, and information about the stock was widely and publicly available. Nettesheim Aff. ¶¶ 16–17. During the proposed class period, between seven and 163 market professionals traded Resource America, Inc. common stock. Further, between December 1997 and February 1999, there were 33 different registered market makers who traded Resource America, Inc. common stock, and at least four market makers in each month. Nettesheim Aff. ¶¶ 18–19. Resource America, Inc. issued a Form S–3 Registration Statement during the class period. Second Amended Complaint ¶¶ 62–65; Nettesheim Aff. ¶ 20 (stating that six Forms S–3 were filed between February 5, 1998 and April 24, 1998). Finally, the stock price of Resource America, Inc. common stock dropped upon the emergence of rumors questioning its accounting procedures and dropped again upon publication of the Roberts' Report which revealed its misleading

accounting practices—demonstrating a cause and effect relationship between unexpected corporate news and the price of Resource America, Inc.'s stock. Second Amended Complaint ¶¶ 85, 93; Nettesheim Aff. ¶¶ 21–29.

■ The Court concludes that the plaintiffs have met their burden in demonstrating the existence of the *Cammer* factors. However, defendants argue that notwithstanding evidence of the *Cammer* factors, the market could not have been efficient because of the very nature of the allegations made by plaintiffs. That is, by definition, the market for Resource America, Inc. common stock could not have been efficient since the Roberts' Report was based entirely on public information. Otherwise stated, if the market was efficient, and there was in fact wrongdoing, the market would have adequately assimilated the information upon which the Roberts' Report was based and the stock price would have behaved accordingly.

In order to rule on this argument, the Court finds it necessary to explain in some detail the efficient market hypothesis. An efficient market is one in which prices reflect available information. There are generally considered to be three forms of efficient markets: weak form, semi-strong, and strong form. A weak form efficient market is one in which historical price data are fully reflected in the price of a security. Efficient markets are considered semi-strong when all publicly available information is reflected in the price of a security. The strong form of an efficient market occurs when the price reflects all information, including that information not publicly available. *See* Louis Loss & Joel Seligman, *Securities Regulation* 181–2 n. 41 (3d ed.1992). The *Basic* court adopted the semi-strong form of market efficiency as a prerequisite for a fraud on the market presumption.[12]

---

**10.** Market makers are generally large brokerage houses that trade in a specific number of shares at a specific price. *See Griffin v. GK Intelligent Sys., Inc.,* 196 F.R.D. 298, 303 (S.D.Tex.2000).

**11.** "Only corporations whose stocks are actively traded and widely followed are allowed to use the S–3 form by the SEC." *O'Neil v. Appel,* 165 F.R.D. 479, 501 (W.D.Mich.1996).

**12.** The Court notes that the *Basic* Court never used the phrase "semi-strong." However, the Supreme Court stated in *Basic* that "[r]ecent empirical studies have tended to confirm Congress' premise that the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Basic,* 485 U.S. at 246, 108 S.Ct. at 991. It went on to hold that

Commentators have noted that an efficient market cannot be perfectly efficient. *See, e.g.,* Richard Booth, Essay, *The Efficient Market, Portfolio Theory, and the Downward Sloping Demand Hypothesis,* 68 N.Y.U. L.Rev. 1187, 1195 (1993). It takes some amount of time for new information to get incorporated into the price of a security. Loss and Seligman called this "The Efficiency Paradox." They noted that

a perfectly efficient market is impossible because securities analysts and other market professionals cannot be expected to gather information beyond the point at which they can earn a positive return. Hence an "equilibrium level of disequilibrium" should be normal in which securities prices reflect new information rapidly, but not so quickly that market professionals cannot earn a positive return.

Loss & Seligman, 183 n. 41 (citing Sanford J. Grossman & Joseph E. Stiglitz, *On the Impossibility of Informationally Efficient Markets,* 70 Am. Econ. Rev. 393, 405 (1980)). Otherwise stated, "investors invest in research until the marginal return from research equals the marginal cost." Booth, 68 N.Y.U. L.Rev. at 1195. What this means is that an efficient market is one in which analysts' opinions contribute to the market price of a security, thus becoming novel pieces of information.

From a legal standpoint, defendants are held liable when it is established that a material misrepresentation caused the price of a security to be traded, on an open and developed market, at a value different than its efficient price, which "is presumed to reflect the price at which the security would have traded in the absence of the misleading information." *In re VeriFone Sec. Litig.,* 784 F.Supp. 1471, 1478–79 (N.D.Cal.1992) (citing *Basic,* 485 U.S. at 246, 108 S.Ct. at 991). *See also,* Comment, Robert G. Newkirk, *Sufficient Efficiency: Fraud on the Market in the Initial Public Offering Context,* 58 U. Chi. L.Rev. 1393, 1422 (1991) (to avail themselves of the fraud on the market presumption, plaintiff should only be required to prove

that, absent the alleged fraud, the market price would be unbiased, not that it would be infallible).

An efficient market requires an analyst to make it efficient in many cases. It is the analysts or professional traders who "analyze information about securities, and the trading activity of these knowledgeable investors pushes the price of the security toward a value which reflects all publicly available information." *In re VeriFone Sec. Litig.,* 784 F.Supp. at 1479. An analyst must take the information that is available in the public domain and assemble it in a way that makes sense. It is only at that point that the price of the security can truly reflect the available information. "The fraud-on-the-market theory thus shifts the inquiry from whether an individual investor was fooled to whether the market as a whole was fooled." *Id.* (citing Daniel R. Fischel, *Efficient Capital Markets, the Crash, and the Fraud on the Market Theory,* 74 Cornell L.Rev. 907, 909 (1989)). Therefore, the disclosure of facts without analysis in such a way that is not adequately assimilated by the market, with the result that there is no reaction in the stock price, without more, does not mean that the market is inefficient.

According to plaintiff's allegations, the market for Resource America, Inc.'s common stock was fooled. The information which would have led the market to conclude that there had been fraudulent accounting practices was presented in such a way as to hide its true meaning. It was not until Mark Roberts analyzed the information that the market was able to determine the existence of potential wrongdoing on the part of the defendants, and react to it. When information is made public, but presented in such a way as to render it incomprehensible without specific analysis, later analysis must be considered new information.

The Court concludes the Roberts' Report was new information, to which the market responded. For the purposes of the Motion

"[b]ecause most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations may be presumed for purposes of a Rule 10b–5 ac-

tion." *Id.,* 485 U.S. at 247, 108 S.Ct. at 992. That is the definition of a semi-strong efficient market.

for Class Certification, the market upon which Resource America, Inc.'s stock was traded was efficient. Therefore, plaintiffs are entitled to the fraud on the market presumption of reliance. As plaintiffs are entitled to use the fraud on the market presumption of reliance, they have satisfied the first element of Rule 23(b)(3)—that common issues predominate over individual ones.

### 2. *Superiority*

■ Under Rule 23(b)(3), the Court must next "balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication." *Georgine v. Amchem Products, Inc.,* 83 F.3d 610, 632 (3d Cir.1996) (citations omitted), *aff'd sub nom, Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). First, the Court concludes that a class action is the fairest way to adjudicate the questions raised in this case, as the costs of maintaining individual actions in this sort of securities case would be prohibitive. *See, e.g., Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir.1985) ("Class actions are a particularly appropriate and desirable means to resolve claims based on the securities laws, 'since the effectiveness of the securities laws may depend in large measure on the application of the class action device.'" (quoting *Kahan v. Rosenstiel,* 424 F.2d 161, 169 (3d Cir.1970))); *Rosen v. Fidelity Fixed Income Trust,* 169 F.R.D. 295, 301 (E.D.Pa.1995) ("class certification remains a desirable method of seeking redress under the securities laws, particularly where, as here, 'a large number of individuals [allegedly] have been injured, although no one person may have been damaged to a degree which would have induced him to institute litigation solely on his own behalf.'" (quoting *In re Regal Communications Corp. Sec. Litig.,* 1995 WL 550454, *7 (E.D.Pa.1995))).

Secondly, the class action will not be inefficient or unmanageable. Each class member's claims center on common questions of law and fact—namely whether or not the defendants committed the acts which plaintiffs allege—which require the same sort of proof. *See Crown, Cork & Seal Co., Inc.,* 462 U.S. at 350, 103 S.Ct. at 2396, 76 L.Ed.2d 628

("The principal purposes of the class action procedure [are] promotion of efficiency and economy of litigation....").

Therefore, the Court determines that plaintiffs have satisfied the conditions of Rule 23(b)(3) as common questions of law or fact predominate over individual questions, and a class action is superior to individual suits.

### C. Definition of the Class

"Care should be taken to define the class in objective terms capable of membership ascertainment when appropriate, without regard to the merits of the claim or the seeking of particular relief. Such a definition ... does not require the court to engage in an impermissible consideration of the merits of the claims in connection with its class certification determination." *Rendler,* 182 F.R.D. at 160 (quoting *Newberg on Class Actions* at § 6.14).

By defining the class as proposed by plaintiffs, the Court will not have to engage in any impermissible consideration of the merits of the claim. Thus, the class will be defined as follows:

> All persons who purchased or otherwise acquired the stock of Resource America, Inc. during the period between December 17, 1997 and February 22, 1999, inclusive; excluded from the Class are the defendants, all officers and directors of Resource America and/or any of its subsidiaries, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

### IV. CONCLUSION

The Court notes that the certification of a class is not a final order, and the Court retains jurisdiction to modify the class until there is a decision on the merits. *See* Fed. R.Civ.P. 23(c)(2) ("An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits.") "[T]he Committee Notes on Rule 23 envision modification of a class certification 'if, upon fuller development of the facts, the original determination appears unsound.'"

*Zenith Laboratories v. Carter–Wallace,* 530 F.2d 508, 512 (3d Cir.1976). As this case proceeds, the Court will examine whether the prerequisites for class certification remain satisfied, and will act accordingly if they are not.

For the foregoing reasons, as plaintiffs have satisfied the requirements for class certification, the Court will certify the class as defined. An appropriate order follows.

### ORDER

**AND NOW,** this 6th day of August, 2001, upon consideration of plaintiffs' Motion for Class Certification (Document No. 31, filed September 15, 2000); Defendants' Joint Brief in Opposition to Plaintiffs' Motion for Class Certification (Document No. 32, filed November 22, 2000); and Plaintiffs' Reply Memorandum in Support of Their Motion for Class Certification (Document No. 33, filed December 19, 2000); following oral argument on March 16, 2001, for the reasons set forth in the foregoing Memorandum, **IT IS ORDERED** as follows:

1. The plaintiff class, defined as follows, is **CERTIFIED:**

All persons who purchased or otherwise acquired the stock of Resource America, Inc. during the period between December 17, 1997 and February 22, 1999, inclusive; excluded from the Class are the defendants, all officers and directors of Resource America, Inc. and/or any of its subsidiaries, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

2. Plaintiffs' Motion for Class Certification, with the class defined as above, is **GRANTED.**