**In re COREL CORPORATION INC.
SECURITIES LITIGATION.**

No. 00–CV–1257.

United States District Court,
E.D. Pennsylvania.

May 3, 2002.

Stuart H. Savett, Savett, Frutkin, Podell & Ryan, PC, Philadelphia, PA, Charles J. Piven, Baltimore, MD, John Philip McCarthy, Somers Point, NJ, Paul J. Scarlato, Robert Frutkin, Philadelphia, PA, for Plaintiffs.

Jay A. DuBow, Jennifer A. Furman, Wolf, Block, Schorr & Solis–Cohen, LLP, Philadelphia, PA, Andrea Butler, George Wailand, New York City, Sherrie R. Savett, Philadelphia, PA, for Defendants.

## *EXPLANATION AND ORDER*

ANITA B. BRODY, District Judge.

A putative class of investors brings this action against Corel Corporation ("Corel") and its former Chief Executive Officer, Michael C.J. Cowpland ("Cowpland"). Plaintiffs allege that defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act as well as SEC Rule 10b–5, by issuing false and misleading statements regarding Corel's Fourth Quarter 1999 and First Quar-

ter 2000 performance, and prospects for its recently-introduced Linux and other Windows products. According to plaintiffs, defendants made these misrepresentations in order to "hide Corel's dramatically reduced sales revenues, and to convey the false message that sales of Corel's Windows products remained strong . . . [and] that Corel's Linux market was much more mature and significant to Corel's operations tha[n] it actually was."

On March 8, 2000, plaintiffs Basilio and Spagnola filed the original complaint in this action, on behalf of themselves and all others who purchased Corel common stock between December 7, 1999 and December 21, 1999, the day before Corel released a pre-announcement of its Fourth Quarter 1999 loss. On May 12, 2000, class plaintiffs Spagnola, Perron, and Chavez moved for consolidation of all related cases and appointment as lead plaintiffs, as required under 15 U.S.C. § 78u–4(a). Spagnola and Perron made their last purchases of Corel stock on or before December 21, 2000. Chavez made additional purchases of Corel stock at several points during January 2000, and made his final purchase on January 31, 2000.[1] I granted the motion for consolidation and appointment of Spagnola, Perron, and Chavez as lead plaintiffs on July 3, 2000.

On August 14, 2000, lead plaintiffs filed a Consolidated and Amended Complaint, altering their complaint by alleging that defendants Corel and Cowpland engaged in a course of conduct, as opposed to a short-lived and focused attempt, to defraud the public concerning the financial condition of Corel and to artificially inflate the company's stock prices for a period beyond December 21, 1999. This allegation altered the closing date of the class period specified in the original complaint. The amended complaint expands the class and defines it as "all persons who purchased Corel common stock on the NASDAQ national exchange at any time from December 7, 1999, through and including March 20, 2000," expanding the class period for about three months from the date in the initial complaint and beyond the date of the filing of the original complaint.

On January 28, 2002 the parties appeared before me for oral argument on the class certification motion. At that time, the defendant indicated that it did not contest certification of a class as defined in the original complaint, including purchasers of stock between December 7, 1999 and December 21, 1999, but opposed the certification of any class extending beyond that date. Based on that representation, I granted plaintiffs' motion for class certification, subject to my determination of the appropriate class period. Defendants oppose any class that closes after December 21, 1999, on the grounds that plaintiffs have not established the commonality and typicality requirements of Federal Rule of Civil Procedure 23(a) because the investors who purchased their stock after that date differ from plaintiffs purchasing during the originally requested class period.[2] After considering the written and oral arguments of the parties and the applicable law, I find it appropriate to certify the class proposed by plaintiffs' amended complaint, comprised of all persons who purchased Corel common stock on the NASDAQ national exchange at any time from December 7, 1999, through and including March 20, 2000.

## I. Factual Background[3]

On June 21, 1999 Corel announced its results for the second quarter of 1999, which had ended May 31, 1999. In a press release, the company touted their "return to profitability," and several officials, including then CFO Michael O'Reilly and defendant Michael Cowpland, made public statements of their

---

1. Though plaintiffs originally failed to indicate that Chavez made these purchases after December 21, 1999, subsequent pleadings have corrected this. Plaintiff Chavez's 2000 purchases are relevant to the certification issue and I will discuss them later.

2. Plaintiffs initial motion included a request to appoint Ben Lacy as an additional class representative. Defendants opposed this request, and as plaintiffs have withdrawn their motion as to Lacy, the discussion is moot.

3. Because at this stage of the litigation, I must assume the facts alleged in plaintiffs' complaint are true, I have taken the account of events from the consolidated and amended class action complaint.

continued confidence in the financial success of Corel. After the close of the third quarter, on August 31, 1999, Corel issued a similarly optimistic statement, claiming "strong results" for that quarter and included a statement from O'Reilly that the financial troubles of the company were over and indicated that the "outlook for Q4 remains positive."

In November 1999,Corel became a "Linux" company and the stock price rose from between $6 and $8 per share to a price of $13.4375 on November 17, 1999.[4] The fourth quarter ended on November 30, 1999. Plaintiffs allege that at that point or shortly thereafter, Corel became aware that it suffered losses during that period. However, during the time between the end of the quarter and the announcement of those losses on December 22, 1999, representatives of the company persisted in making optimistic public statements about Corel's soundness and success.

On December 7, 1999, Corel announced the resignation of its executive vice president of sales and marketing, effective the end of that calendar year. The release made a point of indicating that although the company remained in a "quiet period" concerning fourth quarter earnings, the departure was unrelated to "any performance or financial issues." Two days later, defendant Cowpland appeared on CNNFn's Streetsweep program for two interviews. During the first interview, Cowpland attributed the recent jump in stock price to Corel's "huge Linux story," and in the second, he stated that although he could not provide details, based on shipped products in the fourth quarter, "the numbers will be pretty impressive," and that the company was moving very much in a positive direction. That day, Corel stock closed at $39.25 per share.

In the wake of these statements, a series of newspaper articles appeared which continued to give strong indications of Corel's fourth quarter success. On December 10, 1999, in an article in the *Computer Dealer News*, Cowpland appeared optimistic about his company's prospects for growth and heralded its current successes. An article that appeared on December 12, 1999 in the *Sunday Business Group*, discussed the market's "mania" over Linux companies and specifically cited the 772% growth in share price of Corel stock after announcing its Linux distribution. It also noted that Cowpland had sold some of his own shares "just a few weeks ago." The next day, Cowpland appeared on CNBC and hinted that Corel anticipated a strong fourth quarter performance based on Linux sales growth and its core Windows business. This interview prompted an article in the *Ottawa Citizen*, noting that Corel's share prices rose after Cowpland's comments, at the same time the prices of other "Linux-inflated issues were falling." On December 15, 1999, Corel announced the resignation of O'Reilly, their CFO. The release indicated that the departure came at a time when the company was in sound financial shape for both the present and future and expressly denied any connection between the resignation and the impending announcement of fourth quarter losses. Cowpland perpetuated this idea the following day when in a press release he noted that O'Reilly had "put us back on a profitable track."

Contrary to these earlier positive statements, on December 22, 1999 Corel announced that it anticipated reporting a fourth quarter loss of more than $8.5 million on declining revenues on $61 million. Despite this bad news, the company put a positive spin on it by noting the profitable year and attributing the losses to Windows-based products and focusing on a bright future with Linux-based products. The same day that Corel pre-announced the fourth quarter losses, Cowpland participated in a conference call, published in *Interactive Investor*, where he blamed losses on the old Windows products and encouraged investors to view them

---

4. According to plaintiffs, Linux was an, open source, free software program intended to compete with Microsoft's Windows operating system. While the system generated a great deal of excitement, Corel could anticipate that profits from the system would not immediately replace the profits from their Windows based sales. According to plaintiffs, in attempt to obtain sufficient funds to obtain the cash flow necessary to continue historical operations Corel tried to acquire a corporation with significant cash reserves and hoped to artificially inflate the market price of its stock by misrepresenting the fiscal health of the company.

as a Linux company, citing their relatively low valuation as compared to other Linux leaders. On December 22, 1999, Corel stock closed at $13.1875 per share, down from the previous day's price of $18.5625 per share. Though Corel did not announce its anticipated losses until late December, O'Reilly, the former CFO, admitted that Corel had early indication of the slow sales of Windows-based products and that the company's increase in expenses had been anticipated, rather than coming as a surprise. Moreover, because Corel monitored its sales at least on a monthly basis, it would have been aware of the decelerating sales volume prior to December 22, 1999.

On January 18, 2000, Corel formally announced the results for the fourth quarter of 1999 and held a conference call discussion of them. Though certain tax credits permitted Corel to show a profit, the announcement was consistent with the December 22 pre-announcement and the company posted an operating loss on the quarter. Again, Corel blamed slow sales and unanticipated expenses and optimistically touted its significant role in the Linux market. However, the release also declared that Corel had "made significant progress in restoring its financial base while at the same time, maintaining the momentum of its flagship CorelDRAW and WordPerfect brands," and anticipated leveraging "those strengths into the Linux marketplace." By the time Corel released this statement, seven weeks had elapsed in the first quarter of the new fiscal year. During those seven weeks, the sale of Windows based products decreased sharply, endangering the financial well-being of the company and rather than increasing, sales of Linux products dropped as well.[5] In a conference call immediately following the press release, company officials stated the opposite of this and when questioned indicated that indicators showed the momentum of sales in Linux products carried into the new year.

The following week, on January 25, 2000 Corel continued singing the praises of its Linux business, describing their beginning as "stunning." On February 7, 2000 Corel announced that it had entered into a "definitive merger agreement" with the United States company Inprise/Boland, which, would, as combined, allow Corel to operate as a "Linux powerhouse." Shareholders of Inprise/Boland were to get .747 shares of Corel stock in return for each of their shares, requiring Corel to issue 53.7 million shares, based on their closing valuation on February 4, 2000. Cowpland, in yet another conference call, touted the merger and noted that Corel led the market in Desktop Linux OS and other applications. He also noted the $3.1 million in revenues from the previous quarter, equaling the sales of Red Hat, a more established Linux market leader, and called the growth was "exponential." When asked for a prediction of Linux revenues in the upcoming fiscal year, Cowpland stated that he expected somewhere between $20 and $30 million. He also denied any intention of phasing out Windows products, noting those were the "cash cow," of the company and did not disclose the dismal first quarter sales figures. Similarly, Cowpland did not disclose that Corel needed Inprise/Borland's cash reserves to keep operating, declaring instead that as a combined company, they planned to maintain operating profitably. Cowpland echoed many of these statements in an article appearing in *CBS MarketWatch* the same day. In neither place did Cowpland indicate that Windows and Linux sales figures had fallen off pace from the previous quarter.

Just after the close of the first quarter, Corel issued a press release on March 8, 2000 entitled "Corel is Delivering on its Promises," which described successes in both Windows and Linux technology. At the shareholders meeting that same day, Cowpland echoed the sunny sentiments of the news release. Speaking alongside Dale Fuller of Inprise, Cowpland stated that Corel had no need for a back-up plan if the companies failed to consummate the merger and denied that Corel would need to solidify its cash-flow position, expressing comfort with their own situation. When questioned about rumors that first quarter sales were flat, particularly in the Windows market, Cowp-

---

**5.** Though it is unclear if defendants had actual knowledge of this drop, plaintiffs allege that if they did not, their lack of knowledge constitutes reckless conduct.

land indicated that the market was "relatively saturated, but stable."

On March 20, 2000, after the market closed, Corel announced the results of its first financial quarter. The company reported revenues of $44.1 million and a loss of $12.4 million—$.19 per share. This loss also included a $.10 extraordinary gain from Corel's sale of an equity interest in another company, for an actual loss of $.29 per share, almost twice the $.16 loss predicted by analysts, based upon prior statements of the company. Corel also indicated that it expected similar results in the next two quarters, belying the previous optimism about the strength of Windows sales. Though omitted from the press release, Corel admitted that Linux sales, rather than experiencing "exponential growth," actually decreased from $3.2 million in the previous quarter to $2.3 million in the current one. Analysts quickly picked up the story and an article appeared in *CBS MarketWatch* detailing the announcement.

Following the March 20, 2000 announcement, and after the close of the class period, analysts noted that the expected loss might endanger the purchase of Inprise and one article in *CBS MarketWatch* highlighted the drop in Linux revenue. On March 21, 2000, the first trading day after the announcement, Corel shares closed at $10.375 down from $13.375 the previous day. The following month, a former director of Inprise/Borland filed suit in Chancery Court in Delaware against Inprise and Corel, seeking to block their merger and alleging that Corel misrepresented its Linux sales, a primary force behind the merger. On April 18, 2000, the day this suit was filed, share prices dropped from $7.9375 to $6.8348. On April 19, 2000 Corel filed a Form 10–Q with the SEC indicating that it anticipated similar results in quarters two and three. Corel announced the termination of the merger agreement with Inprise/Borland on May 16, 2000 and the implementation of a cost reduction program designed to save them $40 million an-

nually. Following the termination of this agreement, several analysts noted the dire cash flow situation of Corel and noted that while they might survive short term, their long range prospects were "onerous."

## II. Federal Rule of Civil Procedure 23

To obtain certification, a class must satisfy the requirements of Federal Rule of Civil Procedure 23(a) and 23(b). Rule 23(a) sets forth four prerequisites to class certification:

> (1) the class is so numerous that joinder is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). These four requirements are referred to in the short-hand as (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. A court may certify, or decline to certify, in its discretion. *See Weiss v. York Hospital,* 745 F.2d 786 (3d Cir.1984); *Schwartz v. Dana Corp.,* 196 F.R.D. 275 (E.D.Pa.2000).

If the prerequisites of numerosity, commonality, typicality, and adequacy of representation are satisfied, the class also must show that the action is maintainable under Federal Rule of Civil Procedure 23(b)(1), (2) or (3). In this case, lead plaintiffs have moved for class certification on behalf of the class under Rule 23(b)(3), which provides for certification when:

> [T]he court finds that the questions of law or fact common to members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.[6]

> The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the contro-

---

**6.** Fed.R.Civ.P 23(b) also lists four factors to be considered in relation to the determination of whether the predominance and superiority requirements are satisfied:

Fed.R.Civ.P. 23(b)(3). Rule 23(b)(3)'s requirements are often referred to as "predominance" and "superiority." Plaintiffs bear the burden of showing that the prerequisites of Rule 23(a) and the requirements of 23(b)(3) are satisfied.

## III. Discussion

■ Though the defendants have conceded to certification and focus their objections only on particular points, the court must be satisfied that the plaintiffs satisfy all four prerequisites of Rule 23(a) as well as the requirements of 23(b)(3). *See e.g., Arch v. American Tobacco Co.*, 175 F.R.D. 469, 475–76 (E.D.Pa.1997). As a general principle, the determination of class certification under Rule 23 is not intended to be an inquiry into the merits of plaintiffs' claims. *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 166–67 (3d Cir.2001) (discussing Supreme Court cases). Yet where plaintiffs' claims involve complex questions of fact and law, a court may need to " 'delve beyond the pleadings to determine whether the requirements for class certification are satisfied.' " *Id.* at 167 (quoting 5 Moore's Federal Practice § 23.61[5] ). *See also Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 186 (3d Cir.2001); *La Fata v. Raytheon Co.*, 207 F.R.D. 35, 41 (E.D.Pa.2002).

### A. Rule 23(a) Requirements

#### 1. *Numerosity*

■ Rule 23(a)(1)'s numerosity prerequisite does not require plaintiffs to allege a certain number of class members, but only that the class be "so numerous that joinder of all members is impracticable." Fed. R.Civ.P. 23(a)(1). As the Third Circuit recently held, a class consisting of more than forty people generally satisfies the numerosity prerequisite. *See Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir.2001) ("generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met"). *See also Eisenberg v. Gagnon*, 766 F.2d 770,

785–86 (3d Cir.1985) (allegation of 91 class members satisfies numerosity).

■ Here, while plaintiffs report that they do not know the actual number of class members, they note that over five hundred million shares of Corel common stock were sold during the proposed class period. Plaintiffs have not estimated how many class members this number of transactions might include, but the number is almost certainly greater than forty. Furthermore, as plaintiffs argue, joinder is impracticable due to the geographic dispersion of class members. The defendants have not challenged these representations and effectively concede that the proposed class satisfies Rule 23(a)'s requirement of numerosity. I find that the plaintiffs have satisfied this requirement.

#### 2. *Commonality*

■ The Third Circuit has held that the commonality requirement is not stringent and that a single common issue of law or fact will satisfy the requirement of Rule 23(a). *See Johnston v. HBO Film Management, Inc.*, 265 F.3d 178, 184 (3d Cir.2001); *Baby Neal v. Casey*, 43 F.3d 48 (3d Cir.1994). Courts in this circuit also have recognized that securities fraud cases often present a "paradigmatic common question of law or fact" of whether a company omitted material information or made misrepresentations that inflated the price of its stock. *In re Resource America Sec. Litig.*, 202 F.R.D. 177, 181–82 (E.D.Pa.2001) (quoting *Moskowitz v. Lopp*, 128 F.R.D. 624, 629 (E.D.Pa.1989)).

In the instant case, the plaintiffs suggest the following common questions of law or fact:

(1) whether defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act and SEC Rule 10b–5;

(2) whether defendants participated in and/or conspired in the common course of conduct complained of;

(3) whether documents, press releases, reports, and other statements disseminated to the investing public and the Company's

versy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the

claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

shareholders during the Class Period misrepresented and/or omitted material facts concerning the Company's business and financial results;

(4) whether the defendants acted with scienter in knowingly or recklessly omitting and/or misrepresenting material facts regarding the Company's business and financial results;

(5) whether, during the Class Period, the market price of Corel common stock was artificially inflated due to the material misrepresentations and/or non-disclosures complained of;

(6) whether the Class has sustained damages and, if so, the proper measure of damages.

Defendants argue that plaintiffs cannot establish commonality for class members who purchased stock after Corel's December 22, 1999 pre-announcement of an expected loss in its fourth quarter results. According to defendants, the claims of class members who purchased Corel stock after December 22, 1999 present fundamentally different questions of law and fact than pre-December 22 purchasers because they were aware, or at least put on notice, of Corel's expected loss before purchasing the stock. This argument, however, misconstrues the change plaintiffs made in their amended complaint. Instead of focusing on a single incident of misrepresentation, the plaintiffs now advance the theory that the defendants engaged in a systematic course of conduct of misrepresenting the true financial state of the corporation. This question, identified by the plaintiffs as "whether defendants participated in and/or conspired in the common course of conduct complained of," is common to all of the class members and satisfies Rule 23(a)'s requirement that there be at least a single, common issue of law or fact.[7]

### 3. *Typicality*

 Before certifying a class, the court must determine that the claims of the class representatives are typical of the claims of the entire class. This does not mean that the claims of the individual plaintiffs and class representatives must be identical. *See Johnston v. HBO Film Mgmt.*, 265 F.3d 178, 184 (3d Cir.2001). Typicality only requires that the interests of the named representatives and the class as a whole align—making sure the representatives adequately represent and protect the interests of the absentees. *See In re Prudential Ins. Co. of America Sales Practices Litig.*, 148 F.3d 283, 311 (3d Cir. 1998). Where circumstances of some plaintiffs differ sharply from those of others or rely on a distinct legal theories, the class representatives do not satisfy the typicality requirement. A court should deny certification where "the legal theories of the named representatives potentially conflict with those of the absentees." *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 631 (3d Cir.1996). However, where claims involve the same conduct on the part of the defendant, factual differences among the claims cannot alone defeat certification. *See Newton v. Merrill Lynch*, 259 F.3d 154, 183–84 (3d Cir.2001).

Defendants argue that plaintiffs fail to satisfy the typicality requirement because the course of conduct alleged in the amended complaint divides the plaintiffs into two distinct groups. The first group includes all those who purchased stock between December 7, 1999 and December 21, 1999, in advance of the December 22, 1999 pre-announcement of fourth quarter losses. Plaintiffs in the second group purchased stock at some point after the December pre-announcement, through March 20, 2000. Those who purchased stock before Corel announced its losses in December were unaware of any fraud or misrepresentation at the time they purchased their stock. However, those who purchased stock between December 22, 1999 and March 20, 2000 knew of the losses in the fourth quarter of 1999, and the prior misrepresentations of the company. Because of this difference, the defendants contend that these groups necessarily rely on different legal theories.

7. The Third Circuit has recognized the "course of conduct" variety of securities fraud cases. *See e.g., Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 192 (3d Cir.2001); *Newton v. Merrill Lynch*, 259 F.3d 154, 176–77 (3d Cir.2001); *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 191 (3d Cir.1990).

While the first group can rely on the fraud on the market theory, the later purchasers cannot employ this theory because the market had already incorporated the fourth quarter losses into the price of Corel stock after the December 22 pre-announcement.

Once again, however, the defendants misconstrue the allegations in the amended complaint. The plaintiffs bring their claim on the theory that the defendants engaged in a course of conduct to conceal losses and artificially inflate stock prices. Though the original complaint indicated that they uncovered this fraud on December 22, 1999, subsequent investigation and events revealed a more sustained pattern of concealment, and it is under this theory that all plaintiffs now proceed. Representative plaintiffs have a clear interest, aligned with that of absentee plaintiffs, in demonstrating that course of conduct, regardless of when they purchased their stock. Moreover, because plaintiff Chavez made additional purchases of Corel stock after December 22, 1999, defendants can no longer contend that all lead plaintiffs have interests that differ from absentee class members who purchased shares between December 22, 1999 and March 20, 2000. Because all claims involve the same conduct of the defendants—a course of concealing accurate information from the market between December 7, 1999 and March 20, 2000—plaintiffs have satisfied the typicality requirement of Rule 23(a).[8]

### 4. *Adequacy of Representation*

Federal Rule of Civil Procedure 23(a)(4) encompasses the dual requirement that the named plaintiffs do not have any conflict that might prevent them from representing the interests of the class and that their counsel is qualified to represent all plaintiffs. *See In re Prudential*, 148 F.3d at 312. In some measure, the provision acts as a "catch-all requirement that 'tend[s] to

merge with the commonality and typicality criteria of Rule 23(a).'" *Newton*, 259 F.3d at 185 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n. 20, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). While the defendants do not question the abilities of plaintiffs' counsel, they do raise concerns about the ability of the named plaintiffs to avoid conflicts with the full class. However, they have raised these arguments in terms of commonality and typicality, rather than in terms of adequacy of representation.[9] Just as I have determined that the plaintiffs satisfy the requirements of commonality and typicality, I also find that the named plaintiffs and their counsel can serve as adequate representatives of the class.

### B. Rule 23(b)(3)

After demonstrating that they meet the standards for certification articulated by Rule 23(a), plaintiffs must then demonstrate that their claim satisfies the requirements of Rule 23(b), and in the instant case, Rule 23(b)(3). Under Rule 23(b)(3), plaintiffs must show that: (1) "questions of law or fact common to the members of the class predominate over any questions affecting only individual members;" and (2) "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). These two requirements are generally referred to as predominance and superiority.

### 1. *Predominance*

In order to prevail on a 10b securities fraud claim, a plaintiff must show "(1) a false representation of (2) a material (3) fact, (4) the defendant's knowledge of its falsity and his intention that the plaintiff rely on it, (5) the plaintiff's reasonable reliance on the representation, and (6) the plaintiff's result-

---

8. Defendants also raise the argument that because plaintiffs who purchased their stock after the initial fraud period, between December 7 and December 21, will be subject to unique defenses they cannot satisfy the typicality requirements. While courts sometimes address this argument in the context of typicality, in this case, I believe the issue is more appropriately considered in the context of the predominance requirement of Rule 23(b)(3), discussed infra.

9. Defendants brief in opposition to the motion for certification included a specific section on why Mr. Lacy was not an adequate representative of the class. However, as the request to add Lacy as a lead plaintiff has been withdrawn, it has become unnecessary to address these arguments.

ing loss." *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 280 (3d Cir.1992).[10] Though generally, a plaintiff must show actual reliance on the misrepresentation, use of the "fraud on the market" theory entitles the plaintiff to a rebuttable presumption of reliance, as long as he or she purchased the securities in an efficient market. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 178 (3d Cir.2000). The plaintiff must then rebut the presumption of reliance by demonstrating that the market did not respond to the misrepresentations, the plaintiff did not actually rely on those misrepresentations, that the plaintiff did not use the market price in deciding whether to purchase the stock, or that reliance was unreasonable. *See id.* at 179.

In a securities fraud class action, "when a claim is predicated on a fraud in the market theory, there is a presumption that common issues of reliance predominate over any individual issues." *In re Resource America Sec. Litig.*, 202 F.R.D. 177, 188 (E.D.Pa.2001). Here defendants recognize that plaintiffs who purchased their stock prior to the December 22 announcement may rely on the fraud on the market theory and need not individually demonstrate reliance. However, they also claim that any purchasers, including named plaintiff Chavez, who acquired their stock after the December 22 announcement cannot rely on that presumption.[11] According to the defendants, because the market became aware of the alleged misrepresentation, and assuming it operates efficiently, after the pre-announcement the price of Corel stock would have adjusted to reflect the new, curative information. Therefore, those plaintiffs who purchased after Corel released that information must demonstrate actual reliance on the prior misinformation;

and in doing so, will necessarily raise a number of individual questions that will predominate over any issues common to the class.

When considering the duration of a securities fraud class in light of a subsequent disclosure, the court must determine whether the disclosure had a curative effect "so as to render it unreasonable for an investor, or the market, to continue to be misled by the defendants' alleged misrepresentation." *In re Resource America*, 202 F.R.D. at 183. If such a disclosure was "clear and unequivocal" then the plaintiff must demonstrate actual reliance through individualized proof. *Id.* at 183–84. In the instant case, Corel's pre-announcement of expected losses on December 22, 1999 was far from a clear and unequivocal admission of the financial state of the company. Though Corel admitted to losses in the fourth quarter, the statement attributed some of those losses to unanticipated expenditures, something the CFO admitted was false on January 18, 2000. Moreover, in the interviews accompanying the pre-announcement, Cowpland heralded Corel's future as a Linux company and indicated that relative to other Linux leaders, Corel stock was significantly undervalued. The equivocal nature of the December 22, 1999 statements appears even more pronounced when considered in relation to the statements made thereafter. Throughout January and February, and well into March 2000, company officials continued to boast of their confidence in Linux sales, talk of the steady stream of Windows sales, and express general optimism about the financial health of the company. Only on March 20, 2000, when Corel announced its first quarter losses and indicated they expected the same in the second and third quarters, did the company begin to acknowledge the significance of its

---

10. While courts often discuss the 10b violation in terms of a misrepresentation, the same section makes it illegal to engage in a "scheme or artifice to defraud" or a deceptive "act, practice, or course of business." 17 C.F.R. § 240.10b–5 (2001). Where, as here, plaintiffs allege an illicit course of conduct, they will need to demonstrate a series of misrepresentations or omissions constituting a scheme or practice designed to defraud shareholders.

11. In their memorandum, the defendants base their argument on the unique position of proposed lead plaintiff Lacy. Because Lacy purchased his stock while fully aware of the initial misrepresentations, the defendants, argue he must prove actual reliance, rather than relying on the fraud on the market theory. While the plaintiffs have mooted this argument as it applies to Lacy by withdrawing the motion to make him a lead plaintiff, I presume the defendants would assert it applies with equal force to Chavez's post-December 1999 stock purchases.

problems. The initial representations and any statements made between that time and March 20, 2000 were a part of the same scheme or course of conduct designed to defraud investors. The post-December 22, 1999 stock purchasers are entitled to a presumption of reliance based upon these later misrepresentations because they are a part of the same course of conduct as the statements made prior to that point. Based on the allegations in the complaint, Corel failed to cure prior misrepresentations in its December 22 statement.

As a result of this, the class is entitled to the presumption of predominance. *See id.* at 186; *see also Semerenko,* 223 F.3d at 181 (noting that statement curing misrepresentation made prior statements immaterial, but permitting plaintiffs to rely on new misrepresentations included in the same announcement). The defendants have not presented any evidence at this point that is sufficient to defeat this presumption, and render certification inappropriate. In their motion in opposition to class certification, the defendants do not argue that the market failed to respond to the alleged misrepresentations, that plaintiffs did not rely on the misrepresentations, or that plaintiffs did not decide whether to purchase their stock based on the market price. Nor have they shown how, in light of the continued and repeated optimism expressed by the Corel management team about the health of the company, reliance was unreasonable. If it subsequently becomes necessary to modify or shorten the class period at a later stage of the litigation, I have the discretion to do so. *See Barnes v. American Tobacco Co.,* 161 F.3d 127, 140 (3d Cir.1998). However, at this point in time, I find that plaintiffs have demonstrated that issues common to the class predominate over individual questions, and have satisfied the standard encompassed by the rule.

### 2. *Superiority*

■ In finding that a class action is a superior method of adjudicating a controversy, the court must balance the fairness and efficiency of the class action against other alternative forms such as individual lawsuits or consolidation. *See In re Resource Amer-*

*ica,* 202 F.R.D. at 191. In a securities case, use of the class action is particularly appropriate. *See Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir.1985). This is because a large number of plaintiffs may allege injury, but no single plaintiff may have suffered enough damages to induce him or her to institute and bear the costs of an individually litigated lawsuit. *See In re Regal Communications Corp. Sec. Litig.,* 1995 WL 550454, at *7 (E.D.Pa. Sept.14, 1995).

■ Plaintiffs argue that superiority exists for several reasons: (1) absent a class, courts face potentially thousands of lawsuits arising out of Corel's alleged misrepresentations; (2) certifying a class promotes the efficient use of judicial resources; (3) while some administrative difficulties will arise in the class action suit, those challenges create less of a burden than individual actions; and (4) without the class, many plaintiffs will have no recourse because of the cost associated with bringing an individual suit. The defendants do not challenge the superiority of the class action, and I find that the plaintiffs have demonstrated that the class action lawsuit is superior to any alternative form of adjudicating this controversy.

The class of plaintiffs includes potentially thousands of plaintiffs as over five hundred million shares of Corel stock were traded on the NASDAQ during the relevant period. While some plaintiffs may have traded a large number of shares, other class members may have dealt only in small quantities of the stock. These small traders lack incentives to individually pursue their claims. Additionally, given the large number of shares involved, the plaintiffs will be geographically diverse, making joinder of claims impracticable. Managing the case as a class action will be both efficient and manageable.

Because all plaintiffs base their claims on common questions of law or fact—whether or not the defendants engaged in a course of conduct concerning the financial situation of the company—the evidence offered in these cases will be nearly identical. Plaintiffs have shown predominance of common questions and superiority of class adjudication and therefore, I find that the plaintiffs have satisfied the requirements of Federal Rule of

Civil Procedure 23(b)(3). As I have already found that the plaintiffs have met the requirements of Federal Rule of Civil Procedure 23(a), I will certify the class proposed by the plaintiffs in their motion for class certification.

## ORDER

**AND NOW,** this day of May 2002, I **ORDER** that the lead plaintiff's motion for class certification is **GRANTED.** I find that the class, as defined below, meets the requirements of Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure. This action is hereby certified as a class action pursuant to Fed.R.Civ.P. 23(a) and (b)(3), on behalf of all persons (excluding defendants) who purchased on the NASDAQ national exchange the common stock of Corel Corporation at any time from December 7, 1999 through and including March 20, 2000 and were damaged thereby.